[Civ. No. 24496.   First Dist., Div. Two.   Sept. 24, 1968.]

ANNE DILLON WETHERBEE, Plaintiff and Respondent,
v. UNITED INSURANCE COMPANY OF AMERICA,
Defendant and Appellant.

Sedgwick, Detert, Moran & Arnold, Eugene Kelly, John R. Stokes, Dorothy L. Steeves, and Michael D. Calligan for Defendant and Appellant.

Maurice J. Hindin, Ronald M. Sohigian, Hindin, McKittrick & Powsner, Tankel, Toll, Lertzman & Leavitt and Ernest S. Gould as Amici Curiae on behalf of Defendant and Appellant.

Mitchell, Henderson & Dedekam and Clifford B. Mitchell for Plaintiff and Respondent.

SHOEMAKER, P. J.—Plaintiff Anne Wetherbee brought this action against defendant United Insurance Company of

America to obtain declaratory relief, together with compensatory and punitive damages.

Plaintiff's first count alleged that she had purchased two policies of health and accident insurance from defendant, the first in 1958, the other in 1960; that said policies provided for a total payment of $150 per month in the event of a disability requiring continuous confinement within doors; that plaintiff was totally and permanently disabled as the result of a stroke in 1964 and that defendant then commenced paying her $150 per month; that on February 4, 1966, defendant advised plaintiff that her file had been reviewed and that it would make no further payments and would discontinue her insurance coverage as of January 15, 1966; that a controversy had arisen between the parties as to whether plaintiff's condition constituted a "confining sickness" within the meaning of the two policies.

The second count of the complaint alleged that within 30 days of purchasing the first of the two insurance policies, plaintiff returned the policy to defendant and requested that the same be canceled and her money refunded; that upon receiving said request, defendant represented to plaintiff that the policy provided for the lifetime payment of benefits to plaintiff if she were permanently disabled by sickness or injury; that at the time of making said representation, defendant knew it to be false; that the representation was fraudulent and made with the intent to deceive plaintiff and induce her not to cancel her policy; that plaintiff at all times believed the representation to be true and, in reliance on such belief, did not cancel her policy and subsequently purchased a second policy; that defendant knew at all times that the insurance benefits were essential to plaintiff's sustenance and medical care and also knew that it was obligated to continue to pay said benefits to plaintiff; that defendant's conduct was oppressive to plaintiff.

Plaintiff prayed for a declaration that her condition constituted a "confining sickness" within the meaning of the two insurance policies; a judgment in the amount of $150 per month for each month from and after January 15, 1966 to the date of trial; a decree compelling defendant to pay further benefits of $150 per month until such time as plaintiff's condition improved; and punitive damages in the sum of $500,-000.

The facts are without substantial conflict. On July 28, 1958,

defendant insurer issued to plaintiff, a woman then in her late fifties, a benefit policy which obligated defendant to pay plaintiff $50 per month in the event she became totally disabled, suffered a total loss of time and required continuous confinement within doors and regular attendance by a physician.

Within a month after the issuance of the policy, plaintiff became dissatisfied with it because, as she interpreted the policy, it could be canceled at the whim of defendant. She therefore mailed the policy to defendant's San Francisco office and asked that the same be canceled and her premium returned.

Defendant thereafter mailed the policy back to plaintiff, enclosing a letter dated August 21, 1958 and purportedly signed by defendant's "Pacific Coast Manager," Louis Hirschorn. This letter assured plaintiff that "[a]ccording to the provisions of your policy, when you are sick or hurt you will draw your benefits as long as you live. Your policy cannot be terminated nor do you have to send in any further premiums on your policy when you are permanently disabled."

According to Mr. Hirschorn's deposition, the letter in question was a form letter prepared by defendant insurer's former general counsel. Although Mr. Hirschorn denied that he had actually signed the letter, he conceded that it had undoubtedly emanated from his office.

After receiving the letter of August 21, 1958, plaintiff made no further attempt to cancel her policy and continued to pay the premiums thereon. In addition, she subsequently purchased from defendant a second benefit policy which was issued on July 15, 1960. This policy, like the first, contained a "confining sickness" provision which obligated defendant to pay plaintiff $100 per month in the event she incurred such a disability.

In February 1964, while both policies were still in effect, plaintiff suffered a stroke which resulted in the loss of the major functions of her right arm and leg and the right side of her face. She was thereafter incapable of performing even the simplest household chores, required assistance to feed and clothe herself and was unable to get up when she fell. She was required to spend the majority of her waking hours in a chair and was ambulatory only to the extent that she was capable of a slow shuffle performed with the aid of a brace, a crutch and the assistance of another person. According to the testimony

of Dr. Welton, an internist who examined her at the time of her stroke and again shortly before the trial, plaintiff was totally and permanently disabled and required regular medical care. He denied that her condition had in any way improved during the two and one-half years following her stroke.

The evidence pertaining to plaintiff's activities during the period following her stroke was to the effect that she was actually confined to her apartment at least 90 percent of the time. She rarely left the apartment except to obtain medical treatment and was always assisted by another person. On two occasions, she attended meetings of a club to which she belonged, and she also went to church on several occasions.

During the two years following her stroke, defendant insurer paid plaintiff $150 per month under the two policies. However, the payments were frequently late, and plaintiff repeatedly found it necessary to communicate with defendant concerning the delays.

Defendant's records indicate that it had conducted investigations into the extent of plaintiff's disability and confinement in June and August 1964 and again in August 1965, and that the information derived from said investigations was to the effect that plaintiff left her home only to visit her doctor and required crutches or a wheelchair and the assistance of another person on such occasions.

On October 13, 1965, defendant wrote plaintiff's physician, Dr. Davis, requesting supplemental data "[i]n order that adequate reserves be established for this account and so there will be no interruption in the payments now being made. . . ." In a postscript to the letter, defendant directed the following inquiry to Davis: "It appears that patient is not continuously confined within the house. Is this correct?"

Dr. Davis wrote, "This is correct," after the postscript and returned the letter to defendant. Subsequently, on October 26, 1965, he wrote defendant and explained his reply to the postscript in greater detail, stating that when plaintiff made her monthly visits to his office, "She walks with the aid of a crutch, foot brace and the assistance of another person. . . . In answer to your footnote 'Is she continuously [sic] confined within the house?' No she is not, but she must have assistance."

Defendant subsequently sent plaintiff a $150 check covering the period from November 25 to December 25, 1965, and ad-

vised her in writing that "This represents the final payment . . . based on the medical report in our file."

Plaintiff thereafter retained counsel who wrote defendant on January 24, 1966, assuring it that plaintiff was still confined to her home and inquiring as to the basis for defendant's decision to discontinue plaintiff's benefit payments. Defendant replied, by letter of February 3, 1966, that it had been advised by Dr. Davis that "[w]hile total disability continues, . . . the condition is not of such severity to cause continuous house confinement." On the following day, defendant wrote plaintiff and advised her that it had not approved continuance of her coverage as of January 15, 1966.

At the conclusion of the trial, the jury returned a verdict in favor of plaintiff and against defendant insurer and awarded her compensatory damages in the amount of $1,050 and punitive damages in the amount of $500,000. Following the entry of judgment on the verdict, defendant moved for a new trial and said motion was denied. Defendant appeals from the judgment.

Defendant has directed all of its arguments on appeal toward the proposition that the award of punitive damages was improper and the result of errors occurring at the trial and prejudice and passion on the part of the jurors. Defendant apparently does not question the propriety of the award of compensatory damages and concedes that under the rule applied in *Norager* v. *Mountain States Life Ins. Co.* (1935) 10 Cal.App.2d 188 [51 P.2d 443], the jury was justified in finding that at all times subsequent to her 1964 stroke, plaintiff was continuously confined indoors, within the meaning of the two insurance policies, and thus entitled to benefit payments of $150 per month.

With regard to the alleged invalidity of the punitive damages award, defendant first contends that since the instant action was essentially one for breach of a contract to indemnify and since punitive damages are not recoverable in contract actions, the trial court erred in even submitting the issue to the jury.

In support of this argument, defendant correctly points out that Civil Code, section 3294, provides for the recovery of punitive damages only "[i]n an action for the breach of an obligation not arising from contract," and that Insurance Code, section 10111, provides that "[i]n life or disability insurance, the only measure of liability and damage is the sum

or sums payable in the manner and at the times as provided in the policy to the person entitled thereto.''

Defendant relies upon *Contractor's etc. Assn.* v. *California Comp. Ins. Co.* (1957) 48 Cal.2d 71, 77 [307 P.2d 626], and *Reichert* v. *General Ins. Co.* (1968) 68 Cal.2d 822 [69 Cal. Rptr. 321, 442 P.2d 377], as authority that punitive damages may not be awarded in a contract action even though the defendant's breach was wilful or fraudulent.

Plaintiff concedes that defendant's statement of the law is accurate as far as it goes; however, plaintiff cites a number of cases in support of the rule that such damages are recoverable in a tort action, based upon the plaintiff's having been fraudulently induced to enter into a particular contract, even though the tort incidentally involves a breach of contract. (See, for example, *Thompson* v. *Modern School of Business* (1920) 183 Cal. 112 [190 P. 451]; *Berning* v. *Colodny & Colodny* (1930) 103 Cal.App. 188 [284 P. 496]; and *Sharp* v. *Automobile Club of Southern Cal.* (1964) 225 Cal.App.2d 648 [37 Cal.Rptr. 585].)

In *Berning* v. *Colodny & Colodny, supra,* at pages 190-191, the court quoted as follows from 8 California Jurisprudence, section 113, page 872: '' ' ''The rule as to damages in actions upon contract is the same whether the breach be by mistake, pure accident or inability to perform it, or whether it be willful and malicious; the motives of the party breaking the contract are not to be inquired into.'' Where, however, the action is not on the contract, but is based on the fraud by which it was induced, the fact that the contract fixes the compensation does not prevent recovery of exemplary damages.' ''

In *Chelini* v. *Nieri* (1948) 32 Cal.2d 480 [196 P.2d 915], plaintiff was held not to be entitled to an award of punitive damages because he had pleaded a cause of action based solely upon the contract. However, the court stressed the fact that the plaintiff's problem was one of pleading only and stated, ''The above recited evidence, viewed most favorable to plaintiff, would permit the conclusion that defendant was guilty of the tort of deceit; i.e.. that defendant intended to and did induce plaintiff to employ him by making promises which he did not intend to (since he knew he could not) perform and that plaintiff justifiably relied upon such promises and believed that they had been performed, to his damage. [Citations.] Had this action been based upon fraud, exemplary

damages might have been allowed even though the operative facts amounted also to a breach of contract. [Citation.] But the cause of action pleaded and presented to the triers of fact . . . was based only on contract.'' (P. 487.)

Although the language in *Chelini* is obviously dicta, the court in *Sharp* v. *Automobile Club of Southern Cal., supra,* upheld the plaintiff's right to an award of punitive damages on the basis of a complaint strikingly similar to that in the instant action. In *Sharp,* plaintiff had renewed a policy of automobile liability insurance in reliance upon defendant insurer's representation that a particular provision of the policy was applicable whether or not there was other valid and collectible insurance. In fact, defendant insurer had changed its practice prior to the date on which plaintiff's policy was renewed and no longer made payments under the circumstances represented to plaintiff. When plaintiff thereafter submitted a claim which was in part covered by other insurance, defendant initially procrastinated, repeatedly promising to pay, but ultimately refused to honor the claim in full. Plaintiff then brought suit, basing the first and second counts of his complaint on the policy, and alleging in a third count that defendant's representation relative to coverage was fraudulent since defendant knew that it was not in accord with its actual practice and had no intent of fulfilling it. The appellate court held that an award of both compensatory and punitive damages would be proper.

In the instant action, the first count of plaintiff's complaint was essentially one upon contract, in that she sought a judicial determination that at all times subsequent to her 1964 stroke, she had been continuously confined indoors, within the meaning of the two policies, and was therefore entitled to receive benefits of $150 per month.

However, pursuant to the second count of her complaint, plaintiff clearly stated a cause of action in tort, alleging that when she sought to cancel her policy in August 1958, defendant induced her not to do so by means of the knowingly false representation that she would receive lifetime benefit payments under said policy in the event she was permanently disabled by reason of sickness or injury. This count of plaintiff's complaint would appear identical, in all material respects, with that in the *Sharp* case and accordingly stated a cause of action for which punitive as well as compensatory damages could properly be awarded.

■ Defendant next contends that plaintiff failed to either plead or prove that she suffered any actual damages as a result of defendant's alleged fraud and that the trial court therefore erred in instructing the jury that it could award her punitive damages if it found the fraud allegations of her complaint to be true.

We find no merit in defendant's claim that plaintiff did not plead any actual damages resulting from defendant's fraud. Plaintiff's complaint states that as a result of defendant's representation, plaintiff was induced not to cancel her first insurance policy and to purchase a second in the belief that they entitled her to benefits which defendant in fact had no intention of paying. It follows that at the very least, plaintiff suffered actual damage in the amount of the premiums paid over a period of five and one-half years for insurance coverage which was not as represented. ■ It is settled that although punitive damages are recoverable only where actual damages are recovered, the actual damages need not be more than nominal. (*Muller* v. *Reagh* (1957) 150 Cal.App.2d 99, 101 [309 P.2d 826].)

Defendant's contention that actual damages resulting from the fraud were not proved is an ingenious one. Defendant reasons that since plaintiff made every attempt to establish, during the course of the trial, that she was covered by the "confining sickness" provisions of the two policies and thus entitled to benefits of $150 per month on a contractual theory, she proved, in effect, that she sustained no damages from defendant's alleged fraud because she actually received precisely what she paid for in terms of full insurance coverage.

■ Defendant also asserts that the trial court erred in instructing the jury as follows: "The issues to be determined by you are as follows: 1. Is the plaintiff continuously confined within . . . doors within the meaning of the insurance policies? 2. Did defendant commit one or more fraudulent misrepresentations to plaintiff and thereby induce her to purchase or renew the policies? If you answer both questions in the negative, you shall return your verdict for the defendant. If you answer either question in the affirmative, you shall return a verdict to plaintiff for compensatory damages. If you answer the second question in the affirmative, you shall answer a third question, namely: 3. Should punitive damages be awarded against defendant . . . ?" Defendant argues that this instruction was extremely misleading because it

authorized the jury to find both that plaintiff was entitled to full coverage under the two insurance policies and that she had been defrauded and could, therefore, recover punitive damages. According to defendant, the two findings are utterly inconsistent with one another because the existence of full insurance coverage precludes the possibility of plaintiff's having suffered any actual damage as a result of defendant's fraudulent conduct.

The basic fallacy in defendant's argument is that the pleading and proof in the instant action would support a finding that defendant's fraud consisted not so much of a misrepresentation as to the coverage furnished by it under the terms of its policies but of a misrepresentation as to its willingness to live up to those terms. Thus the jury could properly have found that plaintiff's disability was at all times such as to entitle her to full benefits under the terms of the policies but that defendant, despite its representation to the contrary, had never at any time intended to comply with those terms and, in fact, consistently refused to do so. The damage resulting from this wrongful conduct—the payment of premiums for coverage which defendant never intended to provide— clearly cannot be deemed nonexistent merely because plaintiff has now recovered judgment against defendant and has thus obtained redress for its wrongful conduct. Under the circumstances here present, it was entirely proper for the trial court to instruct the jury that it could find insurance coverage as well as actionable fraud.[1]

Defendant also contends that the award of punitive damages was improper because the evidence was insufficient as a matter of law to establish that defendant made a fraudulent misrepresentation which was relied upon by plaintiff. We do not agree.

The evidence shows that after plaintiff wrote defendant in August 1958 and asked that her first insurance policy be canceled, she received a letter from defendant assuring her that her policy entitled her to draw lifetime benefits when she was sick or hurt and that said policy could not be terminated while she was permanently disabled. Plaintiff's reliance upon the representations contained in this letter is demonstrated by

---

[1]The fact that the award of compensatory damages was in the amount due under the policies ($1,050) is of no significance because counsel for both parties stipulated to an instruction fixing the compensatory damages at that amount regardless of whether such award was based on a contract or tort theory.

the fact that she thereafter abandoned her attempt to cancel the first policy and subsequently purchased a second policy of the same type as the first. Defendant's intent not to live up to the representations contained in its letter can clearly be inferred from its subsequent conduct. (*Boyd* v. *Bevilacqua* (1966) 247 Cal.App.2d 272 [55 Cal.Rptr. 610]; *Wilson* v. *Rigali & Veselich* (1934) 138 Cal.App. 760, 765 [33 P.2d 455].) Thus the evidence shows that after defendant had conducted its own investigations following plaintiff's stroke and had failed to obtain any information suggesting that plaintiff was not permanently disabled and continuously confined to her home, defendant sent plaintiff's doctor an artfully worded letter which indicated its desire to assure plaintiff uninterrupted coverage and added, apparently as an afterthought, a postscript inquiring whether plaintiff was continuously confined within her home. Plaintiff's doctor replied that she was not, explaining that she was able to make monthly visits to his office with the aid of a crutch, a foot brace and the assistance of another person. Defendant thereafter terminated the payment of plaintiff's benefits, basing this action solely upon the admission obtained from plaintiff's doctor.

Although defendant makes some attempt to contend otherwise, we are satisfied that the admission by plaintiff's doctor could not have given rise to any good faith belief on defendant's part that plaintiff was no longer permanently disabled and continuously confined to her home under any reasonable construction of the two policies. To the contrary, the "confining sickness" provisions of both policies issued to plaintiff expressly provide that the insured's right to recover under said provisions "shall not be defeated because he visits his physician for treatment . . . when such treatment cannot be administered in the home of the Insured." Under these circumstances, it is obvious that defendant's eagerness to seize upon the admission by plaintiff's doctor as a ground for cancellation of plaintiff's benefits furnishes ample support for a finding that it never intended to fulfill either the representations in its letter of August 1958 or the terms of the two policies. Since an award of punitive damages was thus proper on the basis of defendant's fraud, it is unnecessary to discuss defendant's contention that it was not guilty of malice or oppression.

Defendant next contends that even if an award of punitive damages was proper, the amount of the award in the

instant case is so grossly disproportionate to the award of actual damages that it must be deemed excessive as a matter of law. Defendant also contends that certain errors occurring at the trial undoubtedly contributed to the size of the award in that (1) the trial court erroneously refused defendant's requested instruction that punitive damages must bear a reasonable relationship to the actual damage; (2) the court erroneously admitted into evidence certain self-serving communications from plaintiff to defendant; and (3) plaintiff's counsel was erroneously allowed to argue to the jury that it should base its award of punitive damages upon the harm which defendant had undoubtedly inflicted upon many other policy holders like plaintiff.

It is settled that a reviewing court's power to declare an award of punitive damages excessive exists only when from the facts the amount appears at first blush to suggest passion or prejudice on the part of the jury. (*Finney* v. *Lockhart* (1950) 35 Cal.2d 161, 164 [217 P.2d 19].) In the instant case, although the nature of defendant's wrongful conduct was certainly such as to support a substantial award of punitive damages, the disparity between the actual damages of $1,050 and the punitive damages of $500,000 is suggestive of passion or prejudice. Defendant points out that its review of the reported decisions in this state indicates that the award of punitive damages in this case is the largest ever awarded both in magnitude *and* in relation to actual damages. Although plaintiff cites one case, *Reynolds* v. *Pegler* (S.D. N. Y. 1954) 123 F.Supp. 36, wherein the court upheld an award of $1 in compensatory damages and $100,000 in punitive damages, that case is readily distinguishable from the instant case, since it was a libel action wherein the precise amount of the compensatory damages sustained was of necessity difficult to ascertain. *Toole* v. *Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689 [60 Cal.Rptr. 398], also relied upon by plaintiff, similarly lends no real support to her position. In that case, although the plaintiff had recovered general damages in the amount of $175,000, the trial court reduced the award of punitive damages from $500,000 to $250,000.

A review of the authorities cited by both parties leads unerringly to the conclusion that the award of punitive damages in the instant case was excessive as a matter of law. We must therefore reverse the judgment insofar as it awards plaintiff punitive damages in the amount of $500,000 and remand the

case for a new trial on that issue. (See *Livesey* v. *Stock* (1929) 208 Cal. 315, 323 [281 P. 70] ; *Booth* v. *Peoples Finance etc. Co.* (1932) 124 Cal.App. 131, 145-146 [12 P.2d 50] ; *Wilkinson* v. *Singh* (1928) 93 Cal.App. 337, 345 [269 P. 705] ; *Plotnik* v. *Rosenberg* (1921) 55 Cal.App. 408, 411 [203 P. 438].)

We now discuss certain points which may arise upon the retrial. First, defendant would appear entitled to an instruction placing some limit on the jury's discretion relative to the amount of punitive damages to be awarded. The court below rejected that portion of defendant's requested instruction which advised the jury that "A sum, if any, awarded as exemplary or punitive damages must bear a reasonable relationship to the actual damage, if any." The instructions actually given by the court advised the jury that the allowance and amount of such damages was "within [its] discretion."

Defendant's rejected instruction was correct as far as it went and was based upon statements of the law contained in prior appellate court decisions of this state. (See *Toole* v. *Richardson-Merrell, Inc., supra,* at page 719 ; *Plotnik* v. *Rosenberg, supra,* at p. 410.) Since the instructions actually given by the court may have led the jury to believe that it had a virtually unbridled discretion in setting the amount of the punitive damages, the creation of any such impression should be avoided through the giving of an appropriate instruction (for example, we suggest that out of the consideration of BAJI 172-A and the authorities we have cited that counsel can readily prepare a proper instruction).

A second point which may arise upon retrial concerns the propriety of admitting into evidence, as did the court below, certain letters and telegrams sent by plaintiff, her husband and her attorney, to defendant. The communications in question were sent during the period following plaintiff's stroke and preceding defendant's final denial of coverage under the two policies. The letters and telegrams contain complaints concerning delays in the payment of plaintiff's monthly benefits and explanations as to her urgent need for the payments. Defendant objected to their admissibility at the trial on the ground that they were self-serving declarations constituting hearsay. Plaintiff's counsel, on the other hand, argued that they were admissible to show plaintiff's reliance on the August 1958 letter explaining her rights under the

policy and also to show defendant's bad faith and that it was fully advised of the severity of plaintiff's disability and her need for the payments. The trial court admitted the documents into evidence and gave no limiting instruction as to the purpose for which they could be considered by the jury.

The documents in question are replete with self-serving statements and should not have been admitted as evidence of the facts therein stated, such as that defendant was in fact repeatedly late in making benefit payments to plaintiff. On retrial, it is at least questionable that any of the communications should be admitted into evidence (see *Budaeff* v. *Huber* (1961) 194 Cal.App.2d 12, 22 [14 Cal.Rptr. 729]) and it is clear that limiting instructions should be given as to any portions deemed admissible. Proof of the delay in the payment of plaintiff's benefits, which is relevant to show defendant's unwillingness to fulfill its prior representations to plaintiff and the terms of its policies, must be made in another manner than through plaintiff's self-serving statements to that effect.

Defendant asserts that plaintiff's counsel, during his argument to the jury, treated the case as one of "mass fraud" and repeatedly suggested that defendant's excellent financial condition was the result of its having defrauded numerous other policyholders in the same manner as plaintiff. The position taken by plaintiff's counsel during argument was apparently based solely upon the evidence that the letter of August 1958 was a form letter which defendant's agents were authorized to send in response to inquiries such as that made by plaintiff. However, the record contains no evidence that the letter in question was in fact sent to any other policyholders and likewise contains no evidence that any other policyholder ever relied to his detriment upon the terms of the letter. Under such circumstances, the remarks of plaintiff's counsel were improper and did exceed the scope of legitimate comment upon the evidence.

That portion of the judgment awarding plaintiff punitive damages in the amount of $500,000 is reversed and remanded for a retrial upon that issue. In all other respects the judgment is affirmed. Each party to bear their respective costs.

Agee, J., and Taylor, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 20, 1968.